# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LYNELL TUCKER, | : | |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | Civ. Act. No. 17-1871-LPS |
| | : | |
| ROBERT MAY, Warden, and | : | |
| ATTORNEY GENERAL OF THE | : | |
| STATE OF DELAWARE, | : | |
| | : | |
| Respondents.[1] | : | |

---

## MEMORANDUM OPINION

Lynell Tucker. *Pro se* Petitioner.

Maria T. Knoll, Deputy Attorney General of the Delaware Department of Justice, Wilmington, Delaware.  Attorney for Respondents.

March 19, 2021
Wilmington, Delaware

---

[1]Warden Robert May replaced former Warden Dana Metzger, an original party to the case. *See* Fed. R. Civ. P. 25(d).

STARK, U.S. District Judge:

## I.     INTRODUCTION

Pending before the Court is an Application for a Writ of Habeas Corpus Pursuant to 28

U.S.C. § 2254 ("Petition") filed by Petitioner Lynell Tucker ("Petitioner").  (D.I. 1)  The State filed

an Answer in Opposition, to which Petitioner filed a Reply.  (D.I. 28; D.I. 46)  For the reasons

discussed, the Court will dismiss the Petition.

## II.    BACKGROUND

As summarized by the Delaware Supreme Court in Petitioner's post-conviction appeal, the

facts leading up to his arrest and convictions are as follows:

> [O]n September 14, 2011, Dominique Helm ("Helm") was shot in the
> back outside his mother's home in Wilmington.  Helm's mother,
> Nicole, testified that before the shooting she was standing in her
> kitchen and heard her son arguing with someone.  She looked out the
> window and saw two men, whom she identified in court as [Petitioner]
> and his father, Tony Dunn.  The two men approached her son and
> told him to go back inside his house.  Nicole opened the window and
> told her son to come inside.  She was walking toward her front door
> when she heard her son trying to open the door.  Nicole heard a shot,
> her front door opened, and her son stepped through the door and
> collapsed.  The forensic expert testified that Helm died from a single
> gunshot wound to his back.
>
> Helm's cousin, Devin Marsh, testified at trial that he and Helm were
> hanging out on the porch of Shakeem Davis.  Davis lived in his
> grandmother's house, which was across the street from Helm.  Marsh
> testified that [Petitioner] came along and had words with Helm and
> Marsh.  [Petitioner] drove off in a green truck but returned on foot a
> few minutes later.  When he returned, [Petitioner] approached Helm,
> again exchanged words with him and then punched Helm in the face.
> A scuffle ensued.  During the fight, [Petitioner] was on top of Helm.
> Dunn appeared and began hitting Helm.  When the physical fight
> ended, Helm and [Petitioner] continued to argue.  [Petitioner] then
> pulled out a gun and shot Helm.
>
> Davis also testified.  He stated that Helm was his cousin because Davis'
> father and Helm's father are brothers.  He also testified that
> [Petitioner] is his cousin because Dunn is his mother's brother.  At

trial, Davis stated that he was hanging out with Helm on the day of the murder. He saw [Petitioner] earlier in the day but claimed not to have seen him later. The State offered into evidence a taped statement that Davis had made to police the day after the murder. The trial court allowed the taped statement into evidence over defense counsel's objections. In that statement, Davis told police that he had been hanging out on his porch with Helm when [Petitioner] approached and told them that anyone who was not a "Dunn" had to leave. According to Davis' statement, [Petitioner] left and then came back with his father. Davis was inside the house when he heard a gunshot. He ran outside, saw [Petitioner] and Dunn standing in the area, and saw Helm in the doorway of his mother's house, apparently bleeding.

Another witness, Shawn Whalen, testified that he was standing on his porch smoking a cigarette on the night in question when he saw Helm, whom he knew, in an altercation with another man, whom he did not know. During the fight, Whalen saw a third man run over and push Helm away. Whalen heard Helm say to the man with whom he had been fighting, "You're lucky your pop saved your life." Whalen saw the unknown man then pull out a gun and shoot Helm.

After the shooting, [Petitioner] and his father left the scene together. Using cell phone tower records, the police were able to track the pair from Wilmington to Florida. On September 23, 2011, police apprehended [Petitioner], who was found hiding in the trunk of a car, in Florida. [Petitioner] was arrested on multiple charges including Murder in the First Degree. Dunn was arrested several days later at his residence in Wilmington on a felony charge of Hindering Prosecution.

[Petitioner] and Dunn were tried jointly. Dunn testified at trial. [Petitioner] did not. Dunn stated that he was present when Helm was shot. He testified that, before the shooting, he had been working at his garage, which was two blocks away. His son, [Petitioner], had driven to the garage and complained to his father that there were people hanging out and being loud on the steps of his grandmother's house. [Petitioner] started walking back in the direction of his grandmother's, and Dunn followed shortly thereafter. Dunn testified that by the time he walked the two blocks, his son and Helm were engaged in a tussle. [Petitioner] was on top of Helm, so Dunn rushed over to knock his son off of Helm. Dunn testified that after [Petitioner] and Helm were separated, Helm threatened to kill his son. Dunn testified that Devin Marsh then pulled out a black handgun. Dunn thought Marsh was going to shoot [Petitioner], but Marsh fired

2

the gun and struck Helm in the back.  Dunn testified that he feared for
his son's life, so he took him to Florida.

*Tucker v. State*, 173 A.3d 1050 (Table), 2017 WL 5127673, at *2 (Del. Nov. 3, 2017).

On November 11, 2011, Petitioner was indicted on charges of first degree murder,

possession of a firearm during the commission of a felony ("PFDCF"), and possession of a firearm

by a person prohibited ("PFBPP").  (D.I. 28 at 1)  On April 4, 2012, defense counsel filed a

psychiatric report in which Mandell Much, Ph.D., opined that Petitioner was not competent to stand

trial.  In response, the State filed a motion for Petitioner to undergo further psychiatric testing.  On

August 22, 2012, the Superior Court ordered testing at Delaware Psychiatric Center ("DPC").  The

State submitted reports of Stephen Mechanick, M.D., and Douglas S. Schultz, Psy.D., in which both

doctors opined that Petitioner was competent to stand trial.  (*Id.*)

The Delaware Superior Court held competency hearings between November 2012 and

March 2013, during which the Superior Court heard testimony from all three experts.  (*Id.* at 2)

After considering the evidence, the Superior Court concluded: "On the whole, I found the

testimony of Dr. Mechanick and Dr. Shultz that the defendant is competent to be more persuasive

than the testimony of Dr. Much that he is not."  (D.I. 29-20 at 58)  The Superior Court ruled that

Petitioner was competent to stand trial.  (*Id.*)

On August 21, 2013, a Superior Court jury found Petitioner guilty of first degree murder and

PFDCF.  (D.I. 28 at 2)  The Superior Court sentenced Petitioner on November 20, 2013 to life

imprisonment without parole for the first degree murder conviction and to five years at Level V for

the PFDCF conviction.  (*Id.*)  The Delaware Supreme Court affirmed Petitioner's convictions and

sentences on November 21, 2014.  *See Tucker v. State,* 105 A.3d 990 (Table), 2014 WL 7009954 (Del.

Nov. 21, 2017).

3

On April 28, 2015, Petitioner filed in the Superior Court a motion for postconviction relief pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion"). (D.I. 17 at 2)  The Superior Court appointed counsel to represent Petitioner in the Rule 61 proceeding but, after reviewing the case, post-conviction counsel filed a motion to withdraw from representing Petitioner. (D.I 17 at 2)  On February 20, 2017, the Superior Court denied Petitioner's Rule 61 motion and granted the  motion to withdraw.  (D.I. 31-11 at 167)  The Delaware Supreme Court affirmed that decision on November 3, 2017.  *See Tucker,* 2017 WL 5127673.

## III.   GOVERNING LEGAL PRINCIPLES

### A.   Exhaustion and Procedural Default

Absent exceptional circumstances, a federal court cannot grant habeas relief unless the petitioner has exhausted all means of available relief under state law.  *See* 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel,* 526 U.S. 838, 842-44 (1999); *Picard v. Connor,* 404 U.S. 270, 275 (1971).  The AEDPA states, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i)  there is an absence of available State corrective process; or
>     (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The exhaustion requirement is based on principles of comity, requiring a petitioner to give "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan,* 526 U.S. at 844-45; *see also*

4

*Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000).  A petitioner satisfies the exhaustion requirement

by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either

on direct appeal or in a post-conviction proceeding, in a procedural manner permitting the court to

consider the claims on their merits.  *See Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Castille v. Peoples,*

489 U.S. 346, 351 (1989).

A petitioner's failure to exhaust state remedies will be excused if state procedural rules

preclude him from seeking further relief in state courts.  *See Lines v. Larkins,* 208 F.3d 153, 160 (3d

Cir. 2000); *Teague v. Lane,* 489 U.S. 288, 297-98 (1989).  Although treated as technically exhausted,

such claims are nonetheless procedurally defaulted.  *See Lines,* 208 F.3d at 160; *Coleman v. Thompson,*

501 U.S. 722, 750-51 (1991).  Similarly, if a petitioner presents a habeas claim to the state's highest

court, but that court "clearly and expressly" refuses to review the merits of the claim due to an

independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted.

*See Coleman,* 501 U.S. at 750*; Harris v. Reed,* 489 U.S. 255, 260-64 (1989).

Federal courts may not consider the merits of procedurally defaulted claims unless the

petitioner demonstrates either cause for the procedural default and actual prejudice resulting

therefrom, or that a fundamental miscarriage of justice will result if the court does not review the

claims.  *See McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir. 1999); *Coleman,* 501 U.S. at 750-51.  To

demonstrate cause for a procedural default, a petitioner must show that "some objective factor

external to the defense impeded counsel's efforts to comply with the State's procedural rule."

*Murray v. Carrier,* 477 U.S. 478, 488 (1986).  To demonstrate actual prejudice, a petitioner must show

"that [the errors at trial] worked to his actual and substantial disadvantage, infecting his entire trial

with error of constitutional dimensions." *Id.* at 494.

Alternatively, a federal court may excuse a procedural default if the petitioner demonstrates that failure to review the claim will result in a fundamental miscarriage of justice. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wenger v. Frank,* 266 F.3d 218, 224 (3d Cir. 2001). A petitioner demonstrates a miscarriage of justice by showing a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray,* 477 U.S. at 496. Actual innocence means factual innocence, not legal insufficiency. *See Bousley v. United States*, 523 U.S. 614, 623 (1998). In order to establish actual innocence, the petitioner must present new reliable evidence – not presented at trial – that demonstrates "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 537-38 (2006); *see also Sweger v. Chesney,* 294 F.3d 506, 522-24 (3d Cir. 2002).

**B.     Standard of Review**

If a state's highest court adjudicated a federal habeas claim on the merits, the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d). Pursuant to 28 U.S.C. § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the trial. 28 U.S.C. § 2254(d)(1) & (2); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). A claim has been "adjudicated on the merits" for the purposes of 28 U.S.C. § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a procedural or some other ground. *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009). The deferential standard of § 2254(d) applies even "when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." *Harrington v. Richter*, 562 U.S. 86, 98

6

(2011).  As explained by the Supreme Court, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Id.* at 99.

Finally, when reviewing a habeas claim, a federal court must presume that the state court's determinations of factual issues are correct.  *See* 28 U.S.C. § 2254(e)(1).  This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary.  *See* 28 U.S.C. § 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (stating that clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas unreasonable application standard of § 2254(d)(2) applies to factual decisions).

## IV.   DISCUSSION

The Petition asserts the following four grounds for relief: (1) Petitioner did not receive a fair trial because the Superior Court did not address his psychological deficiencies "outside" the issue of his competency to stand trial; (2) defense counsel provided ineffective assistance by failing to pursue a trial strategy highlighting *mens rea*; (3) Petitioner did not receive equal opportunity/protection of the law for a "neuro-psychologically deficient/imbalanced/individual" and for being court ordered to "a deadly and unsafe environment without stabilizing therapeutic treatment or access to such;" and (4) the trial judge failed to acknowledge Petitioner's rights as a "disabled/psychological deficient impaired individual" and denied his request for new counsel prior to trial.  (D.I. 1)

### A.   Claim One: Competency Determination

In Claim One, Petitioner contends that he was denied his due process rights at trial because the Superior Court and defense counsel did not address or acknowledge his alleged psychological impairments.  To the extent Petitioner alleges that defense counsel should have addressed his

7

psychological impairments by pursuing a mental illness defense, the Court addresses that contention with respect to Claim Two. To the extent Petitioner alleges that the Superior Court should have addressed his mental health issues in a context other than establishing Petitioner's competency to stand trial, the Court addresses that contention with respect to Claim Four.

In order to provide Petitioner with a comprehensive review, the Court liberally construes Claim One as alleging that the Superior Court erred in finding Petitioner competent to stand trial. On direct appeal, the Delaware Supreme Court affirmed the Superior Court's competency determination. Therefore, Claim One will only warrant relief if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

The clearly established federal law governing competency issues is the standard announced in *Dusky v. United States*, 362 U.S. 402 (1960), and *Drope v. Missouri*, 420 U.S. 162 (1974). As explained by the Supreme Court:

> the Constitution does not permit trial of an individual who lacks "mental competency." *Dusky* defines the competency standard as including both (1) "whether" the defendant has "a rational as well as factual understanding of the proceedings against him" and (2) whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." 362 U.S., at 402. *Drope* repeats that standard, stating that it "has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." 420 U.S., at 171.

*Indiana v. Edwards*, 554 U.S. 164, 169-70 (2008).

Turning to the first prong of the § 2254(d)(1) inquiry, the Court notes that the Delaware Supreme Court stated that the standard for competency was "'whether or not the defendant has sufficient present ability to consult with his lawyer rationally and whether he has a rational as well as a factual understanding of the proceedings against him.' The United States Supreme Court has also

added the requirement that a defendant be able to 'assist in preparing his defense.'" *Tucker*, 2014 WL 7009954, at *2. The Delaware Supreme Court cited *Drope* and Delaware precedent which, in turn, cited *Duffy*. Consequently, the Delaware Supreme Court's decision was not contrary to clearly established federal law. *See Faby v. Horn*, 516 F.3d 169, 196 (3d Cir. 2008) (concluding state court's decision was not "contrary to" clearly established federal law where it relied on state court cases which themselves articulated proper standard derived from Supreme Court precedent); *Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause.").

The Court must further determine if the Delaware Supreme Court unreasonably applied the standard articulated in *Drope* and *Dusky* in rejecting Petitioner's argument that he was not competent to stand trial. Significantly, when a state court renders a determination as to competency, its

> determinations on the merits of a factual issue are entitled to a presumption of correctness on federal habeas review. A federal court may not overturn such determinations unless it concludes that they are not "fairly supported by the record." We have held that a state court's conclusion regarding a defendant's competency is entitled to such a presumption.

*Demosthenes v. Baal*, 495 U.S. 731, 735 (1990). The Supreme Court has identified several factors to be considered when assessing a defendant's competency to stand trial, including attorney representations, prior medical opinions regarding the defendant's mental competence to stand trial, evidence of the defendant's prior irrational behavior, and the defendant's demeanor at trial. *See Drope*, 420 U.S. at 177 n.13, 180. However, "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change" in his competency. *Id.* at 181. Consequently, in order to satisfy the requirements of due process, a

9

trial court must *sua sponte* conduct a competency hearing when there is a reason to doubt the

defendant's competency and the evidence is sufficient to put the trial court on notice of a potential

competency problem. *See Pate v. Robinson*, 383 U.S. 375, 385 (1966).

Before Petitioner's trial began, defense counsel filed a psychiatric report in which Dr. Much

opined that Petitioner was not competent to stand trial. (D.I. 29-3 at 27)  The Superior Court held

three days of competency hearings, during which it heard testimony from the three experts who

evaluated Petitioner, and extensively reviewed their reports and other records. (D.I. 29-3 at 66-190)

After the hearing, the Superior Court ruled that Petitioner was competent to stand trial. The

Superior Court explained that, although Dr. Much testified that Petitioner was not competent to

stand trial, it found "the testimony of Dr. Mechanick and Dr. Schultz that [Petitioner] is competent

to be more persuasive," specifically highlighting the following factors as relevant to its determination

of competency:

> testimony that some of the [Petitioner's] test results were affected by a
> lack of effort or motivation on his part; the lack of any persuasive
> reason to think his competency has declined since the last time he was
> found competent to stand trial; evidence that [Petitioner] does not
> suffer from any psychiatric illness; the defendant gave composed and
> lucid testimony at his previous trial; Dr. Mechanick's findings on page
> 26 of his report; Dr. Schultz's finding that [Petitioner's] intellectual
> functioning likely falls in the range of Borderline Intellectual
> Functioning (*i.e.*, an IQ between 71 and 84); the comments in Dr.
> Schultz's report concerning Dr. Much's use of the MacCAT-CA; and
> the fact that other medical experts who have examined [Petitioner]
> have found him competent.

(D.I. 29-3 at 191)

After his conviction, Petitioner appealed the Superior Court's competency determination,

arguing that "the weight of the evidence supported a finding that he was incompetent to stand trial

and that the trial court improperly credited the reports of the State's experts over Dr. Much's

report." *Tucker*, 2014 WL 7009954, at *2.  The Delaware Supreme Court conducted *de novo* review

of the Superior Court's competency determination and affirmed the Superior Court's judgment.  *Id.*

The Delaware Supreme Court found Petitioner's claim "unpersuasive in light of the entire record,"

holding that the "extensive reports of Dr. Mechanick and Dr. Schultz" satisfied the State's burden of

establishing competence by a preponderance of the evidence and supported the Superior Court's

finding that Petitioner was competent to stand trial and participate in his own defense.  *Id.*

The Delaware Supreme Court explained that Dr. Much tested Petitioner's competency

through the administration of the MacArthur Competence Assessment Tool – Criminal

Adjudication ("MacCAT-CA").  Dr. Much concluded that Petitioner "could not articulate, in his

own words, an appreciation of charges or the decision making skills required to act in one's best

interest in a hypothetical case scenario." *Tucker*, 2014 WL 7009954, at *1.  The Delaware Supreme

Court also reviewed the record with respect to the information provided by the State's experts and

explained:

> Both doctors opined that [Petitioner] was competent to stand trial.
> The State's experts provided a number of reasons for finding
> [Petitioner] competent.  Specifically, the experts found that: (1)
> [Petitioner's] lower IQ scores and poor tests results were due to his
> lack of effort or motivation, (2) [Petitioner] was previously found to
> be competent by other doctors, and there had been no intervening
> event since that time that would have caused [Petitioner's] capacity or
> competency to deteriorate, (3) [Petitioner] had no psychiatric disorder
> that rendered him incompetent, and there was no evidence he suffered
> from psychosis, delusions, or hallucinations, (4) [Petitioner] gave
> composed and lucid testimony at his 2007 trial,[2] and (5) [Petitioner]
> had Borderline Intellectual Functioning – an IQ between 71 and 84.
> Additionally, Dr. Mechanic and Dr. Shultz distinguished their
> evaluations of [Petitioner] from Dr. Much's evaluation by pointing out
> that Dr. Much had relied on the MacCAT-CA, "which employs the use

---

[2] Dr. Mechanick testified that this testimony was "evidence not just of potential capacity but
actually his performance, which is very telling about his ability to stand trial." (D.I. 29-3 at 102; *see
also* D.I. 29-4 at 18-19; *Pate v. Robinson*, 383 U.S. 375, 386 (1966) (finding demeanor at trial
relevant to retrospective competency analysis).

> of a hypothetical case scenario, rather than asking questions about the
> defendant's actual case."

*Tucker*, 2014 WL 7009954, at *1.

The Delaware state courts' extensive analyses demonstrate that the state courts properly

considered all of the factors set forth by the Supreme Court for use in assessing a defendant's

competency. The Delaware state courts' determination that Petitioner was competent to stand trial

is reasonably supported by the record, and Petitioner has not provided any clear and convincing

evidence to rebut that determination. Thus, the Court concludes that the Delaware Supreme Court

reasonably applied clearly established federal law in denying Petitioner's contention that he was not

competent to stand trial due his "neuropsychological impairments and deficiencies," and its rejection

of Claim One was not based on an unreasonable determination of facts in light of the evidence.

Accordingly, the Court will deny Claim One for failing to satisfy the standards set forth in

§ 2254(d)(1) and (2).

## B.    Claim Two: Ineffective Assistance of Counsel

In Claim Two, Petitioner contends that defense counsel provided ineffective assistance by

failing to provide or pursue a trial strategy highlighting *mens rea*. Petitioner appears to be reasserting

an argument he presented in his Rule 61 appeal, namely, that defense counsel should have used his

alleged mental deficiencies as a defense to the charges at trial. *See Tucker*, 2017 WL 5127673, at *3.

The Delaware Supreme Court denied Petitioner's argument as meritless. Therefore, Claim Two will

not warrant relief unless the Delaware Supreme Court's decision was either contrary to, or an

unreasonable application of, clearly established federal law.

The Supreme Court precedent governing ineffective assistance of counsel claims is the two-

pronged standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. *See*

12

*Wiggins v. Smith*, 539 U.S. 510 (2003).  Under the first *Strickland* prong, a petitioner must demonstrate

that "counsel's representation fell below an objective standard of reasonableness," with

reasonableness being judged under professional norms prevailing at the time counsel rendered

assistance.  466 U.S. at 688.  Under the second *Strickland* prong, a petitioner must demonstrate

"there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different."  *Id.* at 694.  A reasonable probability is a "probability

sufficient to undermine confidence in the outcome."  *Id.*  A court can choose to address the

prejudice prong before the deficient performance prong, and reject an ineffective assistance of

counsel claim solely on the ground that the defendant was not prejudiced.  *See Strickland,* 466 U.S. at

698.

  In order to sustain an ineffective assistance of counsel claim, a petitioner must make

concrete allegations of actual prejudice and substantiate them or risk summary dismissal.  *See Wells v.*

*Petsock*, 941 F.2d 253, 259-60 (3d Cir. 1991); *Dooley v. Petsock*, 816 F.2d 885, 891-92 (3d Cir. 1987).

Although not insurmountable, the *Strickland* standard is highly demanding and leads to a "strong

presumption that counsel's conduct falls within the wide range of reasonable professional

assistance."  *Strickland*, 466 U.S. at 689.

  With respect to the first prong of the § 2254(d)(1) inquiry, a "state court decision is contrary

to clearly established federal law if it applies a rule that contradicts the governing law set forth in

Supreme Court precedent, or if it confronts a set of facts that are materially indistinguishable from a

decision of [the Supreme] Court and nevertheless arrives at a result different from that reached by

the Supreme Court."  *Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013).  Here, the Delaware

Supreme Court decision was not contrary to *Strickland* because it correctly identified and applied the

*Strickland* standard to Claim Two.  *See Taylor v. State,* 149 A.3d 241 (Table), 2016 WL 5899236, at *2

13

n. 6 & 8 (Del. Oct. 10, 2016); *Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision

applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not

fit comfortably within § 2254(d)(1)'s 'contrary to' clause.").

     The Court must also determine if the Delaware Supreme Court reasonably applied the

*Strickland* standard to the facts of Petitioner's case. When performing the second prong of the

§ 2254(d) inquiry, the Court must review the Superior Court's decision with respect to Petitioner's

ineffective assistance of counsel Claims through a "doubly deferential" lens.[3] *See Richter*, 562 U.S. at

105. The relevant question when analyzing counsel's performance under the "doubly deferential

lens" "is not whether counsel's actions were reasonable, [but rather] whether there is any reasonable

argument that counsel satisfied *Strickland*'s deferential standard." *Id.* In turn, when assessing

prejudice under *Strickland*, the question is "whether it is reasonably likely the result would have been

different" but for counsel's performance, and the "likelihood of a different result must be

substantial, not just conceivable." *Id.* Finally, when viewing a state court's determination that a

*Strickland* claim lacks merit through the lens of § 2254(d), federal habeas relief is precluded "so long

as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 101.

     The Delaware Supreme Court denied Claim Two after determining that defense counsel's

failure to pursue a mental health defense did not fall below an objective standard of reasonableness.

---

[3]As explained by the *Richter* Court,

> [t]he standards created by *Strickland* and § 2254(d) are both "highly
> deferential," and when the two apply in tandem, review is doubly so.
> The *Strickland* standard is a general one, so the range of reasonable
> applications is substantial. Federal habeas courts must guard against
> the danger of equating unreasonableness under *Strickland* with
> unreasonableness under § 2254(d).

*Richter*, 562 U.S. at 105 (internal citations omitted).

The Delaware Supreme Court explained that defense counsel had "the authority to manage the day-to-day conduct of the defense strategy, including making decisions about when and whether to object, which witnesses to call, and what defenses to develop." *Tucker*, 2017 WL 5127673, at *3. The Delaware Supreme Court then opined that the "record reflects that [defense] counsel conducted a careful pretrial investigation of [Petitioner's] mental health, including having him examined by an expert and vigorously challenging his competency to stand trial." *Tucker*, 2017 WL 5127673, at *3. Moreover, "[g]iven the Superior Court's conclusion that [Petitioner] was competent and given [Petitioner's] father's testimony that [Petitioner] was not the shooter, it was a reasonable trial strategy for defense counsel to pursue a factual innocence defense instead of, and not in addition to, a mental health defense." *Id.* The Delaware Supreme Court explained, "presenting the factual defense that [Petitioner] was not the shooter but that, if he was, it was because of a mental illness, posed a risk of undermining the reliability of the factual defense in the eyes of the jury." *Id.*

It is well-settled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. The record supports the Delaware Supreme Court's conclusion that defense counsel's decision to not pursue a mental health/insanity defense was made after thoroughly investigating the law and facts. Since Petitioner's defense strategy was that he was not the shooter, any argument that Petitioner was the shooter but was mentally ill or insane would have been inconsistent with claiming Petitioner's complete factual innocence. Given these circumstances, the Court concludes that the Delaware Supreme Court reasonably applied *Strickland* in holding that defense counsel's performance was not deficient under the first prong of the *Strickland* test. Accordingly, the Court will deny Claim Two.

**C.      Claim Three: Protection of Law for "Neuro Psychologically Deficient Person"**

In Claim Three, Petitioner asserts that he did not receive equal opportunity and protection

of the law with respect to his case based on his alleged status as a "neuro-psychologically

deficient/imbalanced individual." (D.I. 1 at 8)  Petitioner also alleges that he has been or was

"ordered . . . to a deadly and unsafe environment without stabilizing therapeutic treatment or access

to such" by a Delaware Justice of the Peace Court.  (D.I. 1 at 8)

It appears that Petitioner presented his equal protection argument to the Delaware Supreme

Court on post-conviction appeal,[4] but the Delaware Supreme did not address it.  Given these

circumstances, the Court will review the equal protection argument *de novo*.[5]  *See Holloway v. Horn*, 355

F.3d 707, 718-19 (3d Cir. 2004).

The Equal Protection Clause of the Fourteenth Amendment directs that all similarly

_____

[4]The attorney who was appointed to represent Petitioner in his Rule 61appeal filed a motion to
withdraw along with a Rule 26(c) brief.  In the Rule 26(c) brief, post-conviction appellate counsel
included verbatim the arguments Petitioner had presented in his Rule 61 motion, with one of them
being described as follows: "2. Equal Protection of the Laws: I was denied treatment, violated, +
punished for my disabilities + handicaps."  (D.I. 29-7 at 8)  Post-conviction appellate counsel also
summarized Petitioner's post-conviction appellate arguments, with the closest argument to Claim
Three set forth below:

> Claim 2:  It is unconstitutional to punish someone for disabilities or
> illnesses.  "No evidence shows protection of the stated innocence of
> an individual with an  extended history of disabilities, mental illness,
> nor chemical imbalance in the brain."  Records state that information
> was withheld from trial counsel and defendant.  "Evidence shows
> multiple signs of innocence that were not protected nor addressed
> through counsel nor the investigations."

(D.I. 29-7 at 11)

[5] ***Error! Main Document Only.****De novo* review means that the court "must exercise its independent
judgment when deciding both questions of constitutional law and mixed constitutional questions."
*Williams v. Taylor*, 529 U.S. 362, 400 (2000) (O'Connor, J., concurring).

situated individuals be treated alike. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Two independent legal theories exist upon which a plaintiff may predicate an equal protection claim: the traditional theory and the class-of-one theory. *See Yan v. Penn State University*, 2010 WL 3221828, at *4 (M.D. Pa. Aug. 13, 2010).

The traditional theory protects a plaintiff from discriminatory treatment based on membership in a protected class such as race. *See McLaughlin v. Florida*, 379 U.S. 184, 192 (1964). To assert a protected-class claim, the claimant must demonstrate that (1) he or she is a member of a protected class and (2) the government treated similarly situated individuals outside of the protected class differently. *See Oliveira v. Twp. of Irvington*, 41 F. App'x 555, 559 (3d Cir. 2002). In this context, a claimant alleging a violation of the right to equal protection has the burden to prove "the existence of purposeful discrimination." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). To prevail under the traditional "protected class" theory, a claimant must show that he received different treatment from that received by other individuals similarly situated and that the State (through the courts) acted with discriminatory purpose.

In order to state an equal protection claim under the "class of one" theory (*i.e.*, absent membership in a protected class), a claimant must demonstrate that the government engaged in irrational and intentional differential treatment of him when compared with similarly situated individuals. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

In this case, Petitioner has not articulated a claim under either equal protection theory. His vague and conclusory assertion does not explain how he was allegedly treated differently than any similarly situated individual and also does not assert that he was treated unequally. To the extent Petitioner asserts that he should have received greater treatment than others, he has not presented a constitutionally viable claim.

17

In his secondary claim, Petitioner asserts that he has been or was held in a "deadly and unsafe environment without stabilizing therapeutic treatment or access to such." (D.I. 8 at 8)  Yet he then asserts that he was unable to sign the Petition because he is currently in the prison's mental health treatment program.  (D.I. 1 at 15)  Regardless of the inconsistency, Petitioner appears to be alleging a conditions of confinement claim, which does not present an issue cognizable on federal habeas review. *See Preiser v. Rodriguez*, 411 U.S. 475, 484, 487 (1973).

In short, the Court will deny Claim Three in its entirety for failing to assert a viable claim for federal habeas relief.

### D.  Claim Four: Rights of Psychologically Disabled/Request for New Counsel

In his final Claim, captioned "Due Process/Ineffective Assistance," Petitioner asserts that the trial judge failed to acknowledge the "rights of a disabled/psychological deficient impaired individual" and denied his request for new counsel prior to trial.  Petitioner also states that his request for new counsel in the "pre-trial stages" of case was neglected.  (D.I. 1 at 10)

The Court is not entirely certain how to construe the assertions in Claim Four.  To the extent Petitioner is asserting a variation of his complaints about his competency determination and defense counsel's alleged failure to pursue a mental health defense, the Court denies Claim Four for the reasons already discussed with relation to Claims One and Two.

To the extent Claim Four should be viewed as an independent argument that the Superior Court should have addressed his mental health issues in some context other than a competency hearing, or as an independent argument that the Superior Court should have appointed new counsel to represent Petitioner during his trial, the allegations are vague and conclusory.  "[B]ald assertions and conclusory allegations" do not provide a court with sufficient information to permit a proper assessment of habeas claims, and a habeas court cannot speculate about claims. *See Mayberry v.*

*Petsock*, 821 F.2d 179, 185 (3d Cir.1987). The State theorizes that the portion of Claim Four challenging the Superior Court's actions may be premised on the following statement by the Superior Court during a postconviction hearing dealing with Petitioner's similar complaints about his treatment and ability to proceed *pro se*:

> The Court provided counsel to you for trial. You did not pay for it, it did not cost you anything, and counsel was provided. Counsel was provided to appeal your conviction, and constitutionally the Court's required to do that. Once the conviction was affirmed, the Court has taken upon itself whether it's constitutionally required or not to provide counsel to you to file a Rule 61 postconviction relief. It's done that. It has provided counsel to you at every critical stage, at every critical proceeding. So whatever thought process that you have that the court has not provided you what is required by the constitution or required by rules of this court is simply not true, we have.

(D.I. 29-15 at 86-87) Even if this excerpt illuminates the premise for a portion of Petitioner's argument in Claim Four, the Court concludes that federal habeas relief is not warranted because Petitioner has not provided any legal authority or specific right that has been violated.

Alternatively, the Court concludes that Claim Four's challenge concerning an alleged due process violation caused by the Superior Court is procedurally barred from habeas review. The record reveals that Petitioner did not exhaust state remedies for these particular assertions in Claim Four because he did not present them to the Delaware Supreme Court on direct or post-conviction appeal. At this juncture, any attempt by Petitioner to present these assertions to the Delaware state courts in a new Rule 61 motion would be barred as untimely under Rule 61(i)(1). Since there is no indication that Rule 61(d)(2) and (i)(5)'s exceptions to the bars in Rule 61(i)(1) and (3) apply in this case,[6] any attempt to exhaust state remedies would be futile. Given this futility, the Court must treat

---

[6]Delaware Superior Court Criminal Rule 61(d)(2) and (i)(5) provide that the procedural bars to relief in Rule 61(i)(1), (2), (3), and (4) do not apply to a claim that the court lacked jurisdiction or if the petitioner pleads with particularity either that (1) new evidence exists that creates a strong inference that he is actually innocent or (2) a new rule of constitutional law, made retroactive on collateral review,

Claim Three as technically exhausted but procedurally defaulted, meaning that the Court cannot review the merits of the Claim absent a showing of cause and prejudice, or that a miscarriage of justice will result absent such review.

Petitioner does not assert any cause for his default. In the absence of cause, the Court will not address the issue of prejudice. Additionally, the miscarriage of justice exception to the procedural default doctrine is inapplicable because Petitioner has not provided any new reliable evidence of his actual innocence. Thus, the Court will alternatively deny Claims Four as procedurally barred.

In short, the Court will deny Claim Four because it is conclusory and fails to state a claim, and alternatively, it is procedurally barred.

## V.      PENDING MOTION

Petitioner filed a motion titled "Motion to Order Transfer/Expedite Proceedings." (D.I. 50) To the extent the Moton asks to expedite the case, the Court will deny the Motion as moot given its decision to deny the Petition. To the extent the Motion asks the Court to order Petitioner's transfer from state custody to federal custody, the Court will deny the request for lack of jurisdiction.

## VI.     CERTIFICATE OF APPEALABILITY

A district court issuing a final order denying a § 2254 petition must also decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011); 28 U.S.C. § 2253(c)(2). A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district

---

applies to his case and renders his conviction invalid. *See* Del. Super. Ct. Cr. R. 61(d)(2) and (i)(5). Petitioner does not allege a valid claim of actual innocence, and he does not allege a lack of jurisdiction or that a new rule of constitutional law applies to his Claims.

court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *see also*

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court has concluded that the instant Petition does not warrant relief. Reasonable jurists would not find this conclusion to be debatable. Accordingly, the Court will not issue a certificate of appealability.

## VII.   CONCLUSION

For the reasons discussed, the Court will deny the Petition without holding an evidentiary hearing. An appropriate Order will be entered.

21